**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 24-453** |
| **QUINYON SPELLER** | : | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

Quinyon Speller made a living by selling children for sex. The defendant enticed the minors with the promise of care and affection, before recruiting them into his sex trafficking business. When manipulation, affection, or drugs were no longer enough to maintain his control, Speller resorted to violence to force his victims back into submission.

Speller identified what these vulnerable adolescents needed most, provided it long enough to gain their trust and dependence, and then weaponized that dependence to sexually exploit them for profit. A substantial sentence is necessary to reflect the extraordinary seriousness of that conduct, to account for the lasting harm Speller inflicted on his victims, and to protect the public from a defendant who has repeatedly demonstrated his willingness to exploit the vulnerable for his own benefit.

For these reasons, the government respectfully submits that a sentence of 25 years' imprisonment is warranted, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, which support a sentence of 25 years' imprisonment followed by a term of 15 years' supervised release.

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

## I. BACKGROUND

On March 13, 2025, the grand jury returned a superseding indictment charging the defendant with sex trafficking of two victims. Specifically, the defendant was charged with: sex trafficking of a minor by force, threats of force, fraud, or coercion, and attempt, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1), (b)(2), (c), 1594(a), and (2) (Count One); sex trafficking of a minor, and attempt, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(2), (c), 1594(a), and (2) (Count Two); and sex trafficking by force, threats of force, fraud, or coercion, and attempt, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), 1594(a), and (2) (Count Three).

On February 9, 2026, on the day of trial, Speller pled guilty to all offenses. The parties entered a guilty plea under Federal Rule of Criminal Procedure 11(c)(1)(C), wherein the parties jointly agree that a sentence of imprisonment within the range of 20 to 25 years is appropriate.

For the reasons set forth herein, the government submits that the appropriate sentence is 25 years' imprisonment.

## II. CRIMINAL CONDUCT

At the time of his plea, the defendant admitted that the below factual summary accurately reflected his criminal conduct.

The defendant's criminal charges result from his trafficking of Victim 1 when she was a child, and Victim 2, both when she was a child and as an adult. Law enforcement officers and witnesses who observed the defendant harboring, transporting, providing, advertising, and/or maintaining these victims would have been called as witnesses, had the defendant elected to proceed to trial.

From May 2016 through December 2017, the defendant trafficked Victim 1 when she was

a child. The defendant met Victim 1 when she was approximately 15 years old. The defendant began grooming Victim 1 to engage in commercial sex acts by exposing her to another female who was prostituting herself on the defendant's behalf. At some point, Victim 1 believed she was in a relationship with the defendant and started living with him. Shortly thereafter, the defendant asked the child to engage in commercial sex acts claiming he needed the money. When she agreed, he took photographs of her in her underwear and posted her on Backpage.com, a website that was commonly used to advertise commercial sex offerings, under an alias. Law enforcement later found two of the images used in her Backpage advertisement stored in the defendant's Instagram account.

Thereafter, Victim 1 began engaging in commercial sex acts almost daily whenever she was in the custody of the defendant. The defendant transported her to hotels, motels, and the residences of sex buyers, with the intention that she engage in sex "dates," the term used by traffickers referring to commercial sex acts. All the money earned was surrendered to the defendant. The defendant also continuously physically abused Victim 1 including choking and beating her. Aside from his attacks on Victim 1, she also feared him based on his treatment of others, which included the defendant twice robbing sex customers who had arranged to have a commercial sex act with her and Victim 1 witnessing his physical abuse of Victim 2.

The defendant's trafficking of Victim 1 was witnessed by others, including as follows:

- On May 20, 2016, a sex buyer responded to one of the advertisements posted of Victim 1 and arranged for Victim 1 to engage in a commercial sex act at his residence in Montgomery County, Pennsylvania. The defendant transported Victim 1 to the location of the "date." Once there, the sex buyer observed the defendant having intercourse with Victim 1. When the sex buyer refused to go through with the "date," the defendant threatened him and claimed money was due because the defendant had transported the child to the customer's residence. The buyer provided some money from an ATM to the defendant, but the defendant was not satisfied. Ultimately, Hilltown Police were called to the scene after the defendant and the buyer got into a physical fight. Montgomery Township Police Detective Todd

Walter later searched the sex buyer's cell phone. The contents of the phone confirmed that the buyer arranged a sex date with Victim 1.

- On May 21, 2016, Tinicum Township Police documented responding to a report of domestic disturbance involving the defendant and Victim 1. Police responded to a neighborhood up the street from the Waterfront Motel Inn, another motel where the defendant trafficked Victim 1.

- On May 25, 2015, a Backpage advertisement depicting Victim 1 was posted using Email Account #1. The next day, the defendant transported Victim 1, along with another passenger, from Pennsylvania to a residence in Delaware State, with the intention that she engage in a commercial sex act. When Victim 1 did not go through with the sex date, the defendant assaulted her. Delaware State Police responded to the scene after receiving a report of a domestic disturbance involving Victim 1 and the defendant. Police identified Victim 1 as a runaway child, and she was removed from the defendant's company and returned to a juvenile placement home.

- Later that year, the defendant arranged to pick up Victim 1 from her mother's home and set her up at a hotel. Text messages between the two confirm that the defendant arranged to secretly pick up Victim 1 and take her to a hotel. Photographs show Victim 1 in the company of the defendant in the fall of 2017.

The defendant also trafficked Victim 2 both when she was a child in November 2014, and as a young adult at various times from December 2015 through 2020. Like Victim 1, Victim 2 was also a runaway juvenile. Victim 2, then 17 years old, was introduced to the defendant by another female ("Employee 1") who was dating and "working" for the defendant—that is, this female was engaging in sex "dates" and providing all her earnings to the defendant. At the time, Employee 1 was considered Speller's "bottom," or his most trusted prostitute whom he held responsible for training and supervising his newly recruited sex workers.

Victim 2 met the defendant at a hotel in Philadelphia. At one point, Victim 2 also believed she was dating the defendant. Like with Victim 1, Email Account #1 was used to post Backpage advertisements on behalf of Victim 2 in November 2014. These ads used stock online photographs of females in order to conceal Victim 2's true identity. Thereafter, Victim 2 engaged in commercial sex acts and provided the funds to the defendant. Employee 1 observed Victim 2 engaging in

commercial sex acts on behalf of the defendant both as a minor and an adult. Employee 1 also observed the defendant and Victim 1 together at a hotel.

Law enforcement also observed Victim 2 in the presence of the defendant, including on January 15, 2015, when Bensalem Police Department encountered them together during a prostitution operation. The defendant turned violent towards Victim 2 on numerous occasions, including when she asked for more money, if she refused to engage in commercial sex acts, if she refused to give over the money earned from the sex "dates," considered leaving him, or was otherwise out of line. The defendant also provided her with controlled substances as a form of repayment and manipulation.

Victim 2's fear of the defendant also stemmed from his violence towards others. Victim 2 observed the defendant join together with another to commit an armed robbery of a sex buyer. Victim 2 also witnessed the defendant choke and assault Employee 1.[2]

At some point during the charged time period, Victim 2 left the defendant, but ultimately returned again in 2020, when the defendant offered her drugs with the intention of having her engage in commercial sex acts for him again. Victim 2 overdosed from the drugs provided and woke up in the hospital. Victim 2 thereafter had little to no communication with Speller until he reached out to her during the summer of 2024, in an effort to ascertain her knowledge of this instant federal investigation.

Both Victims 1 and 2 witnessed each other engage in commercial sex acts on behalf of the defendant. The two victims were photographed together in November 2017 and then together with the defendant in December 2017.

---

[2] Employee 1 is an uncharged trafficking victim of Speller. *See* PSR ¶¶ 26 & 27.

On December 9, 2024, the defendant admitted to federal agents that he had had sex with Victim 1 but claimed it was before knowing her true age. According to the defendant, he cut off any relationship with her a couple days later. In recorded calls with others, the defendant identified the passenger who traveled with him as he transported Victim 1 on May 26, 2016, along with Employee 1, his bottom, and his concerns about what would happen if they spoke with investigators.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentence.

**Sex Trafficking via Force, Fraud, or Coercion (Counts One and Three).** The maximum possible sentence which may be imposed as to each violation of 18 U.S.C. § 1591(a)(1) & (b)(1) is life imprisonment, with a minimum of 15 years' imprisonment (which may be ordered to be served concurrently in the event of multiple counts of conviction). The term of imprisonment imposed as to each count of conviction must be followed by a term of supervised release of at least five years, with a maximum term of life. Each count of conviction may further include a fine of up to $250,000, and must include restitution, forfeiture, and a $100 special assessment. A further $5,000 special assessment must be imposed if the defendant is found to be non-indigent.

**Sex Trafficking of a Minor (Count Two).** The maximum possible sentence which may be imposed as to a violation of 18 U.S.C. § 1591(a)(1) & (b)(2) is life imprisonment, with a minimum of 10 years' imprisonment (which may be ordered to be served concurrently in the event of multiple counts of conviction). The term of imprisonment imposed as to each count of conviction must be followed by a term of supervised release of at least five years, with a maximum term of life. Each count of conviction may further include a fine of up to $250,000, and must include restitution, forfeiture, and a $100 special assessment. A further $5,000 special assessment must be imposed if the defendant is found to be non-indigent.

Thus, the total statutory maximum and mandatory minimum penalty that could be imposed is: life imprisonment, a mandatory minimum of 15 years' imprisonment, a lifetime of supervised release, a fine of $750,000, mandatory restitution, forfeiture, and a $300 special assessment. A further $15,000 special assessment must be imposed if the defendant is found to be non-indigent.

**B. <u>Criminal History Calculation.</u>**

Speller has spent his entire adult life committing crimes. He has viciously assaulted people, trespassed into homes, stolen others' personal possessions, and driven drunk— imperiling the lives of innocent members of the community in the process. Notably, despite repeated interventions, his conduct has escalated over the years, from disorderly conduct, to drug offenses, to terroristic threats, to aggravated assault and robberies. His total criminal score of 23 places him in a criminal history category of VI. *See* PSR ¶ 93.

When released from previous terms of incarceration, Speller has failed every single time to reintegrate back into society. Each criminal case involves a protracted record of supervision violations, coupled with the commission of new, serious crimes.

| Conviction Date | Offense | Sentence |
| --- | --- | --- |
| 6/27/2012 | Terroristic Threats | 1 year probation; violated supervision 5 times. |
| 9/19/2013 | Aggravated Assault and Robbery | 11 ½ to 23 months' imprisonment, followed by 4 years' probation; violated supervision 5 times. |
| 5/16/2016 | Possession of marijuana | Six months non-reporting probation |
| 9/29/2017 | Robbery and Criminal Trespass | 4 years' probation; violated supervision 2 times. |
| 3/9/2020<br>3/9/2020 | Theft By Unlawful Taking (two counts of conviction arising from two separate cases) | Time served to 23 months' imprisonment, followed by two years' probation; repeatedly violated supervision and ultimately sentenced to serve 507 days' imprisonment (the balance of his sentence). |
| 3/9/2022 | Driving Under the Influence of a Controlled Substance | 72 hours to six months' imprisonment |
| 5/22/2023 | Driving Under the Influence of a Controlled Substance | Time served to six months' imprisonment |
| 8/19/2021 | Access Device Fraud (two counts of conviction arising from two separate cases) | 3 to 23 months' imprisonment; defendant failed to report for supervision. |

Unsurprisingly, even while incarcerated pending trial, Speller has continued to fail to abide by the requirements of his environment. He has repeatedly flouted the rules of the Federal Detention Center. *See* PSR ¶ 12. His history of violating the requirements expected of him, both while in and out of the community, supports a sentence of 25 years' imprisonment and a 15-year term of supervised release.

### C. <u>Sentencing Guidelines Calculation</u>.

The Probation Office correctly calculated that the defendant's advisory guideline range is based on an offense level of 48, which is calculated at the maximum offense level available of

43, and a criminal history category of VI, resulting in a guideline imprisonment range of life. PSR ¶ 146.

Each of the three counts of conviction, along with Uncharged Victim 1, are grouped separately under USSG § 3D1.1. PSR ¶¶ 36-40. The advisory sentencing guidelines are calculated below:

| **Group I: Sex trafficking of Victim 1 by force, fraud, and coercion** | | |
|---|---|---|
| Base Offense Level | USSG § 2G1.3(a)(1) | 34 |
| Undue influence over the victim | USSG § 2G1.3(b)(2)(B) | +2 |
| Use of computer to entice, encourage, offer, or solicit victim for commercial sex | USSG § 2G1.3(b)(3)(B) | +2 |
| Commission of sex acts | USSG § 2A1.3(b)(4)(A) | +2 |
| | | **40** |

| **Group II: Sex trafficking of Victim 2 as a minor** | | |
|---|---|---|
| Base Offense Level | USSG § 2G1.3(a)(1) | 30 |
| Use of computer to entice, encourage, offer, or solicit victim for commercial sex | USSG § 2G1.3(b)(3)(B) | +2 |
| Commission of sex acts | USSG § 2A1.3(b)(4)(A) | +2 |
| | | **34** |

| **Group III: Sex trafficking of Victim 2 by force, fraud, and coercion** | | |
|---|---|---|
| Base Offense Level | USSG § 2G1.1(a)(1) | 34 |
| | | **34** |

| **Group IV: Sex trafficking of Uncharged Victim 1 by force, fraud, and coercion** | | |
|---|---|---|
| Base Offense Level | USSG § 2G1.1(a)(1) | 34 |
| | | **34** |

The highest offense level is 40. The multiple count adjustment calculation increases the offense level by three levels pursuant to USSG § 3D1.4, resulting in a combined adjusted offense level of 43. Because Speller was convicted of a covered sex crime under USSG § 4B1.5(b)(1), and engaged a pattern of activity by trafficking these victims, each on multiple occasions, the offense level is increased by five levels, to 48. As the sentencing guidelines maximum calculation for an offense level is 43, the final total offense level is **43**.

## IV. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A. Consideration of the 3553(a) Factors Regarding Imprisonment.

#### i. The Nature and Circumstances of the Offense

For years, Speller preyed on vulnerable children, exploited their most basic needs, and used manipulation, drugs, and violence to maintain control over them. The nature and circumstances of Speller's crimes against his victims warrant a sentence of 25 years' imprisonment, followed by 15 years of supervised release.

Speller effectively stole Victim 1's adolescence. When she was just 15 years old, he posed as her boyfriend and exploited the trust and affection that relationship created. He conditioned her to believe that having sex with strangers was how she should support their "relationship," advertised her online to sex buyers, and, on and off for the next three years, transported her throughout the Philadelphia tri-state area to engage in commercial sex. His exploitation of Victim 2 followed the same calculated pattern. Knowing that she was a juvenile runaway in need of shelter, food, and affection, Speller offered those necessities to draw her into his trafficking operation. And knowing that she was becoming addicted to opioids, he plied her with drugs to reinforce his control. When manipulation and drugs were not enough, Speller—a self-professed boxer—resorted to violence against the victims and others, including Uncharged Victim 1, in their presence.

The duration of Speller's conduct is aggravating; so too is his extraordinary persistence. Police repeatedly interrupted his trafficking activities, yet Speller remained undeterred. Even after law enforcement removed Victim 1 from him and placed her in a juvenile facility, Speller seized

upon a day when she was permitted to visit her family, picked her up, and took her directly to a hotel. The intervention designed to protect this child became, to Speller, merely another obstacle to overcome.

Speller could act so brazenly because he believed his control over his victims was stronger than the threat of law enforcement. He conditioned his victims to conceal their identities, minimize his conduct, and lie to police about his control over them. That psychological manipulation prolonged the trafficking and compounded its harm. It took years for these young victims to overcome that control and find the strength to confront the man who had exploited them throughout their adolescence.

This was not isolated or impulsive criminal conduct. It was the sustained exploitation of vulnerable children over a period of years, maintained through calculated emotional manipulation, addiction, violence, and intimidation, and continued despite repeated law-enforcement intervention. The seriousness and duration of that conduct, the profound harm Speller inflicted on his victims, and his demonstrated unwillingness to stop, warrant a sentence of 25 years' imprisonment, followed by 15 years of supervised release.

**ii. The History and Characteristics of the Defendant**

The government's recommended sentence of 25 years of imprisonment appropriately reflects the defendant's background and characteristics. Speller self-reported being raised in an abusive household and running away from home at a young age. PSR at pp. 28-29. He is a high school graduate. PSR ¶ 135. Now in his 30s, Speller reports no history of employment—which makes sense since Speller has supported himself through the ill-gotten payments of sex customers. PSR ¶¶ 139-140. As described further above in Part III.B., Speller has lived a life of crime, consistently defying law enforcement, flouting the law and any requirements imposed upon him,

and eschewing any intervention attempts. What's more, Speller appears to have no desire to change his ways: he has not participated in any educational or vocational training, and he reported no educational aspirations in the future. PSR ¶ 136.

Speller has two children who have been raised and supported by their mothers. He does not financially support his children, nor do his children rely on him in any meaningful way. *See* PSR ¶ 122 ("They know how to deal with me being in jail.").

Speller denied any need for mental health or substance abuse treatment—despite having a prolific polysubstance abuse history. PSR ¶¶ 130, 133, 134. He expressed that he was not interested in participating in any mental health or substance abuse treatment in the future. *Id.*

**iii. The Seriousness of the Offense, Respect for the Law, and Just Punishment**

The government recognizes that the jointly recommended range of 20 to 25 years' imprisonment represents a significant variance from the advisory guidelines range which recommends that Speller spends the rest of his life in prison. The government submits this variance provides the victims with the benefit of a non-trial resolution. A sentence of 25 years, the top of the parties' recommended sentencing range, is sufficient but not greater than necessary to punish this defendant for his crimes, and brings peace and finality to his victims in this case.

Moreover, a sentence of 25 years' imprisonment sends a strong message to the community that the exploitation of vulnerable women and children is egregious and will not be tolerated in a civilized society.

**iv. Need to provide the defendant with educational or vocational training, medical care, or other correctional treatment**

The government has identified no correctional treatment which would affect the appropriate sentence in this case. To the extent the defendant wishes to avail himself of opportunities for betterment through training, education, or treatment, the recommended sentence

will not inhibit those efforts while the defendant is incarcerated or on supervised release.

### v. Deterrence and Consistency in Sentencing

The recommended sentence of incarceration affords adequate deterrence to other would-be sex traffickers and will of course serve to protect the public from further crimes of this defendant for a lengthy period of time. While the agreed upon sentencing range is a variance from the guidelines, it is nonetheless fair and appropriate for the reasons stated above, and serves a strong deterrent effect. The defendant will be incarcerated until he is nearly 60 years old and under supervision for many years thereafter. In addition to a period of incarceration, the defendant will also be a registered sex offender which will serve to caution others in the community. This reality will deter others as well as Speller himself. Such a substantial sentence reflects the defendant's role as a sex trafficker of children and young females.

### vi. Need to Protect the Public from Further Crimes of the Defendant

The Court's sentence also serves a critical role of protecting the public from the defendant. As outlined above, the defendant, at only 34 years old, has a lengthy criminal history and has showed no signs of reform. The defendant also has shown no desire whatsoever to seek treatment, education, or training to better his future. The 25-year term of imprisonment will ensure the defendant can commit no further offenses during that time. Additionally, a term of supervised release of at least 15 years will provide an immense degree of protection upon his release. In total, the defendant will be under the supervision of the federal government for at least 40 years.

### vii. Restitution

Restitution to victims of sex trafficking is mandatory under 18 U.S.C. § 1593, which requires compensation in "the full amount of the victim's losses." 18 U.S.C. § 1593(b)(1). This covers costs incurred for "medical services related to physical, psychiatric, or psychological care,"

"necessary transportation, temporary housing, and childcare expenses," "lost income," and "any other relevant losses incurred by the victim." *See* 18 U.S.C. § 2259(c)(2) and § 1593(b)(3). It also includes "the greater of *the gross income or value to the defendant of the victim's services or labor* or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(b)(3) (emphasis added). This is so, "notwithstanding that [the victims'] earnings came from illegal conduct," *i.e.*, "commercial sex acts within the meaning of 18 U.S.C. § 1591." *United States v. Mammedov*, 304 F. App'x 922, 927 (2d Cir. 2008); *accord, e.g.*, *United States v. Cortes-Castro*, 511 F. App'x 942, 947 (11th Cir. 2013). That is, "the statutory language is clear that mandatory restitution includes not only the victims' actual losses, but also the defendant's ill-gotten gains." *United States v. Webster*, 2011 WL 8478276, at *3 (9th Cir. 2011) (unpublished).

In awarding restitution, the court "need only 'estimate, based on facts in the record,' the victims' losses 'with some reasonable certainty'"—*e.g.*, by estimating the number of commercial sexual encounters engaged in by each victim on a daily or other temporal basis and multiplying it by the estimated amount charged per date. *Id.* (citation omitted). "The amount of restitution need not 'be proven with exactitude.'" *United States v. Williams*, 783 F. App'x 269, 277 (4th Cir. 2019) (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)).

Here, the government requests that restitution be awarded to each of the two victims. The record shows, by a preponderance of the evidence, that the defendant must pay restitution for the ill-gotten gains taken from Victims 1 and 2.

Turning first to Victim 1, here, as the defendant himself acknowledged, he trafficked Victim 1 from May 2016 through December 2017. *See* Govt. Plea Memorandum, at 6. Victim 1, in both sworn testimony and a prior recorded law enforcement interview, described that she made

$140 for 30 minutes, and $200 for one hour, when engaging in commercial sex transactions for the defendant. *See* USAO034944.[3] When asked how often she worked for the defendant, Victim 1 testified that she worked for the defendant every day, and did "as many [dates] as he asked [her] to do." *See* USA034941; 2018 Forensic Interview, Production 2. Victim 1 further stated that a "slow day" consisted of five dates. *See* USAO034941.

As a conservative estimate, Victim 1 thus worked for the defendant for an approximately six-month period. Assuming, using a conservative calculation, that she engaged in five, 30-minute dates per day (the low-end estimate), Victim 1 earned $700 per day. And, assuming that Victim 1 worked a total of 180 days for the defendant, she suffered **a total loss of income of $126,000**.

Victim 2, in turn, worked for the defendant regularly from approximately November 2014 through January 15, 2015. Victim 2 described that, for the first week that she worked for the defendant, she gave the defendant 40 percent of her earnings. *See* USAO039472. After that, he took all the money from her commercial sex transactions. Victim 2 reported that on average she engaged in ten commercial sex transactions every day. While doing commercial sex transactions for the defendant, Victim 2 testified that she made $60 for a 15-minute stay, and up to $200 for a one-hour stay. *See* USAO039473.

Assuming, as a conservative estimate, that Victim 2 participated in five, 15-minute sex transactions for the defendant per day, between November 2014 and January 15, 2015, Victim 2 made $300 per day for the defendant. Based on this calculation, Victim 2 gave the defendant approximately $800 for the first week she worked for him, and approximately $2,100 per week after that date. Altogether, assuming that Victim 2 worked for the defendant for ten weeks during

[3] All of the materials referenced here were previously produced to the defendant as discovery.

this period, she gave the defendant a total of $19,700.

In addition, the defendant also trafficked Victim 2 at various times from December 2015 through 2020. Assuming, as a conservative calculation, that Victim 2 worked for the defendant for approximately three weeks per year between 2015 and 2020, Victim 2 earned $6,300 per year for the defendant. Altogether, for five years, Victim 2 earned $31,500 for the defendant. Therefore, combining these amounts, Victim 2 suffered **a total loss of income of $51,200**.

Accordingly, the total restitution owed, using conservative figures based on the evidence, is **$177,200**.

**B. Supervised Release.**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least 15 years is warranted. As explained above, the defendant presents a lengthy record of criminal conduct, often involving violence, and a repeated history of eschewing supervision requirements. Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pay restitution to victims, § 3553(a)(7). Further, the Sentencing Commission recognizes that "the more serious the defendant's criminal history, the greater the need for supervised release." § 5D1.1 app. note 2. The Commission adds: "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3. While Speller denies any need for substance abuse treatment, his previous convictions for driving under the influence of a controlled substance, and possessing marijuana and drug paraphernalia, support the recommended term of supervised release. So too does the defendant's self-reported history of polysubstance abuse and his lack of interest in pursuing substance abuse treatment.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as the additional condition of: effective immediately, no contact, either direct or indirect with the victims.

## IV. CONCLUSION

For these reasons and subject to any that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government submits that a sentence of 25 years' imprisonment and 15 years' supervised release is appropriate in this case. Such a sentence justly reflects the defendant's despicable exploitation of his victim and protects the community.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s Priya T. De Souza*
PRIYA T. DE SOUZA
Assistant United States Attorney

*/s Eileen Geiger*
EILEEN GEIGER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by electronic filing and e-mail upon:

James F. Brose, Esq.
Brose Law Firm
617 Railroad Ave.
Haverford, PA 19041
Attorney for Quinyon Speller

*/s/ Priya De Souza*
PRIYA DE SOUZA
Assistant United States Attorney

Date: September 2, 2026